IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EUGENE ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 5:14-CV-291 |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 15). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Eugene Robinson's ("Plaintiff" or "Robinson") applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and REMANDS the case back to the Social Security Administration.

## I.  PROCEDURAL HISTORY

On August 7, 2007, Robinson filed applications for Supplemental Security Income benefits and Disability Insurance benefits, alleging disability as of March 8, 2007. (Tr. 107-17). The Social Security Administration denied his claim initially and upon reconsideration. (Tr. 54-74).  Upon Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on

1

September 22, 2009. (Tr. 5-21).  On November 4, 2009, the ALJ issued an unfavorable decision. (Tr. 41-51).  The Appeals Counsel denied Plaintiff's request for review on January 25, 2010. (Tr. 2-4).

On February 1, 2011, the district court reviewed Plaintiff's appeal and remanded the case for further administrative proceedings. (Tr. 463-85).  The Appeals Council subsequently ordered a remand for an ALJ to re-evaluate Plaintiff's application. (Tr. 486-89).  On July 17, 2012, an ALJ convened an administrative hearing where Plaintiff, represented by counsel, appeared and testified. (Tr. 402-83).  A vocational expert ("VE"), Barbara Burke, also appeared and testified. (*Id.*).

On August 2, 2012, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 382-95).  After applying the five-step sequential analysis,[1] the ALJ determined that

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)  If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)  If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)  If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)  If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)  Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

Plaintiff retained the ability to perform past relevant work. (*Id.*).  The Appeals Council denied Plaintiff's request for review, making the ALJ's August 2, 2012, determination the final decision of the Commissioner. (Tr. 363-66).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on May 15, 1957, and was 50 years old as of November 5, 2009. (Tr. 47, 149).  As a result, Plaintiff was considered a "person closely approaching advanced age" for Social Security purposes. 20 C.F.R. §§ 404.1563(d), 416.963(d).  Plaintiff graduated from high school in special education classes. (Tr. 9, 145, 409).  He has past relevant work as a spray painter. (Tr. 428).

### B.  Medical Evidence

#### 1.  Physical Impairments

Robinson treated with his primary care physician, Janet Dailey, M.D., throughout the relevant period.  A September 26, 2007, office note from the doctor indicated that she had treated Robinson on April 18, 2007, at which time he described low back pain with radiculopathy into both legs. (Tr. 235).  Robison stated that most of his pain radiated into the right leg, with some numbness and tingling.  Plaintiff also reported that he walked with a cane for balance, could climb stairs with difficulty, could walk two miles on level ground, and had hypertension.  Dr. Dailey noted Plaintiff's complaint of a "right frozen shoulder," which the physician opined likely was impingement syndrome secondary to supraspinatus tendonitis.  Robinson had reduced abduction on the right arm, but had not undergone physical therapy and refused steroid

---

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

injections.    According to Dr. Daily's report, Plaintiff was left-handed. (*Id.*).    The doctor prescribed Naprosyn. (Tr. 236).

On October 22, 2007, Plaintiff returned to Dr. Dailey, complaining of back pain radiating into his legs, worse on the right. (Tr. 245).   Dr. Dailey observed that Plaintiff used a walking stick.   Plaintiff reported that he could walk three miles on level ground and stairs were hard to climb, though he could climb one flight.   Plaintiff also said he could climb a ladder, squat, carry up to 15 pounds (but not for a long period of time), reach, and pull.   Plaintiff reported no problems with fine or gross manipulation. (*Id.*).   On physical examination, Dr. Daily found that Plaintiff's shoulder abduction was limited and he could not rotate his right shoulder without pain. (Tr. 246).   He was able to bend forward to 60 degrees.   The doctor diagnosed a frozen right shoulder, chronic low back pain, and hypertension. (Tr. 247).   She indicated that Plaintiff needed to see a doctor for his shoulder. (*Id.*).

On November 12, 2007, state agency consultative examiner Paul Scheatzle, D.O., performed a physical examination of Robinson. (Tr. 248-53).   Dr. Scheatzle observed that Robinson walked with a cane that he held in the right hand, had an antalgic gait with decreased stance in the right lower extremity, and had decreased heel strike and toe off of the right leg. There was tenderness on palpation to the right low lumbar paraspinal muscles with guarding and spasm.   Robinson had intact strength in his upper and lower extremities, but slight limitation due to pain in the right shoulder and right leg.   Light touch sensation was subjectively diminished in the right calf region and right lateral foot.   His reflexes were "2/4" in the biceps, triceps, bracioradials, and patella, and "1/4" in the Achilles.   Plaintiff had a decreased range of motion in

the right shoulder, dorso-lumbar spine, and right leg.  Straight leg raising and right shoulder impingement tests were positive.  Dr. Scheatzle indicated that Plaintiff was right-handed.[2] (*Id.*).

Dr. Scheatzle opined that Robinson could:

- Sit and stand frequently, with a change in position every thirty minutes
- Walk one city black
- Lift 20 pounds occasionally or 10 pounds frequently, and carry up to 10 pounds
- Not perform repetitive bending, twisting, climbing, or crawling
- Handle objects, hear, speak, travel, understand, remember, concentrate, socially interact, and adapt within normal limits
- Read and write to approximately a third or fourth grade level on gross testing

(Tr. 249).

A November 2007 x-ray of Plaintiff's lumbosacral spine showed mild degenerative disc disease and minimal levoscoliosis. (Tr. 254).

On January 15, 2008, Plaintiff presented to Dr. Dailey, who noted that Plaintiff was using his left arm more due to severe right shoulder tendonitis. (Tr. 244).  She diagnosed bilateral shoulder tendonitis, recommended physical therapy, and prescribed steroid injections. (*Id.*).  The physician also prescribed Neurontin for nerve pain secondary to chronic sciatic nerve inflammation and Cymbalta. (Tr. 286).

In a letter dated February 15, 2008, Dr. Dailey reported that Plaintiff had enrolled in physical therapy, which he was to attend three times per week for approximately four to six weeks. (Tr. 286).  Robinson felt he had made considerable progress in therapy, significantly increasing the range of motion in his shoulder.  He thought Neurontin helped to alleviate his leg pain and was pleased with the results of Cymbalta.  For the first time, Plaintiff complained of neck pain and his physical therapy evaluation was extended to include this problem.  Plaintiff's

---

[2] Dr. Daily and Dr. Scheatzle's statements regarding Plaintiff's dominant hand are in conflict.  Dr. Daily reported that Plaintiff is left-handed (Tr. 235), while Dr. Scheatzle indicated that Plaintiff is right-handed. (250).

chronic back pain persisted, but he claimed that he was living with it successfully. (*Id.*).  On April 3, 2008, Robinson described pain in his back, legs, and arms. (Tr. 241).  Dr. Dailey suspected that Plaintiff had overexerted himself at physical therapy. (*Id.*).

In August 2008, Plaintiff complained of low back pain and constant pain and burning in his legs. (Tr. 240).  Plaintiff reported pain while performing yard work and difficulty with stairs. Dr. Dailey recommended pain management. (*Id.*).

On August 30, 2008, Plaintiff initiated treatment for his back pain and radiculopathy with pain management specialist Tony Lababidi, D.O. (Tr. 323).  Upon physical examination, Dr. Lababidi noted tenderness over the cervical and lumbar spine and positive lumbar facet loading on the right and left. (Tr. 324).  A neurological evaluation revealed an antalgic gait, but normal sensation and reflexes.  Straight leg raises were negative. (*Id.*). The doctor diagnosed lumbosacral neuritis, spondylosis, and disc degeneration. (Tr. 325).  He recommended lumbar facet joint injections and an increase in Neurontin. (*Id.*).

On September 29, 2008, Plaintiff told Dr. Lababidi he experienced 40 percent improvement after his first injection. (Tr. 320).  A physical examination showed tenderness in the lumbar spine, positive lumbar facet loading, and an antalgic gait, but was otherwise generally unremarkable, with negative straight leg raising. (Tr. 321).  Plaintiff continued treatment with Dr. Lababidi during the period at issue, and the results of the doctor's examinations remained largely unchanged. (Tr. 314-19, 360-62).

In January 2009, Dr. Dailey diagnosed severe osteoarthritis of the spine and chronic back pain, for which she recommended pool therapy. (Tr. 357).  Plaintiff participated in therapy from January 27, 2009, through March 10, 2009, when he was discharged for meeting his goals. (Tr. 237).  Plaintiff was pleased with his progress and planned to return to a fitness program.  His leg

pain was gone, and his back pain was at a level "2 or 3" out of "10." (*Id.*).  Nevertheless, a few months later, on August 14, 2009, Plaintiff reported back pain at a "7 out of 10" to Dr. Lababidi. (Tr. 360-61).

In August 2009, Dr. Dailey completed a medical source statement. (Tr. 358-59).  She opined that Plaintiff could lift up to 20 pounds occasionally and frequently.  The doctor felt that Plaintiff could stand or walk for a total of 30 minutes in an eight hour workday, noting that he walked with a cane to take weight off of his legs.  Plaintiff could sit for a total of one hour. He could rarely or never climb, balance, stoop, crouch, kneel, or crawl, due to chronic back pain as well as difficulty getting up and down. Dr. Dailey also felt that Plaintiff could rarely or never push, pull, or perform fine manipulation; occasionally feel and perform gross manipulation; and frequently reach and handle.  The doctor based these limitations on numbness and pain in Plaintiff's hands.  Dr. Daily recommended a rest break every half hour during the workday and a sit/stand option.  She indicated that Plaintiff had been prescribed a cane. (*Id.*).

## 2.  Mental Impairments

Aside from receiving prescriptions for anti-depressant medication from primary care physician Dr. Dailey, the record does not reflect that Plaintiff underwent additional mental health treatment during the relevant period. (Tr. 286, 355, 357).

During November 2007, John Reece, Psy.D.,[3] performed a consultative psychological examination. (Tr. 281-85).  Plaintiff reported that he began special education classes in the sixth grade and graduated from high school.  On the Wechsler Adult Intelligence Scale ("WAIS-III") Plaintiff obtained a verbal IQ score of 78, a performance IQ score of 85, and a full scale IQ of 79, which fell into the borderline to low average range of intellectual functioning.  On the Wide

---

[3] Plaintiff refers to Dr. Swearingen, the name that appears on the report's letterhead, but Dr. Reece actually performed the psychological evaluation. (Tr. 281-82).

Range Achievement Test ("WRAT-IV"), Plaintiff's reading score was at grade 2.4 and spelling

score was at grade 1.7.  The doctor explained that these scores were in the extremely low range

of functioning, which indicated more of a learning disorder, rather than impaired intellectual

functioning.  Dr. Reece diagnosed major depressive disorder (mild), alcohol abuse in partial

remission, a learning disorder, and borderline intellectual functioning. (*Id.*).  In relevant part, Dr.

Reece provided the following discussion of Plaintiff's work-related mental abilities:

- He had little difficulty understanding or following basic instructions in the evaluation.  He demonstrated mild impairment.  Given his estimated intellectual capabilities, the claimant should not have difficulties comprehending or carrying out simple one- and two-step tasks or learning multi-step tasks.  He may have some difficulty understanding and possibly remembering complex or complicated work instructions.
- The claimant had little difficulty performing repetitive tasks in today's evaluation.  There was no impairment.  His attention and concentration were good. His persistence seemed good.  His pace to perform is adequate.  This was evidenced in the examination by his performance IQ and subtests.

(Tr. 285).

In December 2007, state agency reviewing psychologist John Waddell, Ph.D., conducted

a review of the record. (Tr. 269-72).  Dr. Waddell opined that Plaintiff would work best in a

static work setting where no strict production/time demands were imposed.  He would be capable

of performing simple, routine tasks and some semi-complex tasks, but instructions must be read

to him.  He would be able to relate adequately with others. (Tr. 272).

In March 2008, state agency physician Tasneem Khan, Ed.D., assessed the updated

medical record. (Tr. 304-05).  Dr. Khan concluded that Robinson retained the capacity to learn

and perform simple, repetitive work-like activities in an environment where work-related tasks

were routine and predictable.  He could carry out simple tasks in situations where a supervisor or

coworker was present to explain tasks, give directions, and occasionally redirect. (*Id.*).

8

During March 2009, Dr. Dailey completed a medical source statement addressing Plaintiff's mental abilities. (Tr. 329-30).  She opined that Plaintiff's ability to understand, remember, and carry out simple job instructions was "fair," and his ability to do so with complex or detailed job instructions was "poor." Dr. Dailey also indicated that Plaintiff's ability to maintain attention and concentration for extended periods of two hour segments was poor. Dr. Dailey explained that Robinson was a willing, cooperative individual, with very limited schooling and diminished intelligence secondary to previous drug abuse. (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant did not engage in substantial gainful activity since March 8, 2007, the alleged onset date.

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, right shoulder impingement and tendonitis, learning disorder and major depressive disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that from March 8, 2007, through November 4, 2009, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he could no more than occasionally climb, stoop, twist and crawl.  He could occasionally reach overhead using his non-dominant right upper extremity.  He could perform unskilled, simple and routine tasks which can be learned in thirty days or less by short demonstration and require little judgment.  He could not read prints or diagrams and any required reading must be at or below the third grade level.  He could tolerate minimal stress, meaning tasks can involve no more than minimal interaction with the public, no high production quotas or fast paced work.

6. The claimant is capable of performing past relevant work as a spray painter II.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

9

7. The claimant [has] not been under a disability, as defined in the Social Security Act, from March 8, 2007, through November 4, 2009.

(Tr. 385-95) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535,

545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

### A.  Illiteracy and medical vocational rule 202.09

Robinson contends that he should have been found disabled under medical vocational rule 202.09. The medical vocational guidelines only apply to a claimant when all factors (i.e., age, work experience, physical ability, and education) meet the requirements as set forth in the grid. *LaFond v. Comm'r of Soc. Sec.*, No. 1:10-CV-371, 2011 WL 2650683, at *4 (W.D. Mich. June 13, 2011). As the Sixth Circuit has explained,

> In general, where the characteristics of a claimant exactly match the characteristics in one of the rules of Appendix 2, the guidelines determine whether significant numbers of other jobs exist for the person or whether that person is disabled. However, in a situation where impairments do not precisely match any specific rule, the guidelines are used as a framework to determine whether a claimant is disabled.

*Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004) (internal citations omitted). The regulations also state:

> If your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength and demands of jobs other than the strength demands, we will not directly apply the rules in appendix 2 unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rules provide a framework to guide our decision.

20 C.F.R. §§ 404.1569a(d), 416.969a(d).

The section of Appendix 2's medical vocational guidelines at issue directs a finding of "disabled" to an individual who meets the following requirements: a maximum sustained work capability limited to light work, age 50 to 54, with an education of "illiterate or unable to communicate in English," and whose previous work experience was "unskilled or none." 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.09. The regulations define illiteracy as "the inability to read or write." 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1). A claimant is considered illiterate "if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." *Id.* "Generally, an illiterate person has had little or no formal schooling." *Id.*

Here, the ALJ did not apply Appendix 2, but instead relied on the testimony of a vocational expert to consider whether Robinson could perform any jobs with his particular RFC and vocational characteristics. Plaintiff meets the age and light work requirements of the Appendix 2 rule. The ALJ identified Plaintiff's past work as a spray painter II, classified as unskilled with a specific vocational preparation level of 2.[4] (Tr. 394, 428).

Accepting Plaintiff's age, light weight restrictions, and vocational profile as described by the ALJ, whether Plaintiff meets the requirements of Appendix 2 turns on Plaintiff's literacy. Problematically, the ALJ's opinion failed to explain whether Plaintiff was illiterate. Robinson points to the results of Dr. Reece's WRAT test results, which show that he read at the 2.4 grade level, his verbal comprehension was at the 2.4 grade level, his spelling was at the 1.7 grade level, and his math was at the kindergarten grade level. (Tr. 284). Dr. Reece found that Robinson had "poor" math and reading skills. (Tr. 285). Plaintiff testified that he could read at the third grade

---

[4] DICOT 741.687-018, 1991 WL 680251 (Jan. 1, 2008). Although the VE at September 2009 hearing identified Plaintiff's past work as a painter as semi-skilled, the ALJ rejected this categorization and concluded that the job was unskilled under the DOT. (Tr. 394).

level, including simple instructions, but not a sports page in a newspaper. (Tr. 408-09). Robinson also indicated that he struggled with writing, as his spelling was very poor. (Tr. 409).

In support of a finding of disability, Plaintiff points to *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 450-51 (6th Cir. 1990) where the Sixth Circuit found that an individual with an education attainment of less than the third grade level was considered functionally illiterate.  However, the *Skinner* decision did not rest entirely on the raw test scores, but also relied on expert elaboration on their meaning for the individual claimant. *Robinson v. Comm'r of Soc. Sec.*, No. 5:10-CV-504, 2011 WL 400223, at *10 (N.D. Ohio Jan. 18, 2011). Along with WRAT test results, the *Skinner* court considered a vocational expert's testimony that an individual who reads and writes on the third grade level was functionally illiterate, and the WRAT test administrator's statement that the low test scores indicated limitation that would clearly hinder the claimant in terms of performing any type of work that would require even minimal math or reading capabilities. *Id.*

Additionally, the Sixth Circuit has explained that under the regulations a number of factors may show the intellectual ability of an individual, including education level; past work experience and the kind of responsibility the individual had; an individual's daily activities or hobbies; the results of testing; and how well the individual is able to communicate in English. *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004) (*citing* 20 C.F.R. § 404.1564) (finding a claimant who testified that he could not read or write, was not illiterate because he had a tenth or eleventh grade education, attended mechanic school, and performed semiskilled work his entire life).  Case law from other circuits indicates that the filing of illiteracy is determined on a case-by-case basis absent any clear rule. *Robinson*, 2011 WL 400223, at *10 n.5 (citing cases).

Here, there is some evidence that Robinson may not have been illiterate.  Plaintiff testified that he completed high school, though enrolled special education classes. (Tr. 409).  He also indicated that he could read, to an extremely limited extent, and struggled with writing. (Tr. 408-09).  The VE was not asked to elaborate on the vocational significance of the WRAT test scores and Dr. Reece did not state that Plaintiff was illiterate, but limited his comments to "reading, spelling, and word recognition skills are below average." (Tr. 284).  Nevertheless, Plaintiff's notably low WRAT test scores and his testimony require further scrutiny to determine whether he qualifies as illiterate.

Accordingly, the Court cannot determine as a matter of law that Plaintiff is illiterate for the purposes of the Social Security Act and further proceedings are necessary in order to do so. *Faucher v. Secretary of Health & Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) ("A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking.").  Upon remand for rehearing, the ALJ should address the question of Robinson's literacy and qualification under the grids.

## B.  The ALJ's treating source analysis

Robison alleges that the ALJ erred in his analysis and attribution of weight to physical and mental assessments issued by primary care physician Dr. Dailey, who Robinson asserts qualifies as a "treating source."  It is well established that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  This doctrine, often referred to as the "treating source rule" is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).

14

The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544.  When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6).  The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

Here, Plaintiff argues that the ALJ improperly attributed greater weight to opinions issued by state agency consulting physicians and reviewing psychologists over those of "treating physician" Dr. Dailey.  More specifically, Robinson asserts that the ALJ improperly granted more deference to consultative physician Dr. Scheatzle's opinion regarding Plaintiff's physical abilities and reviewing psychologists Drs. Waddell and Khan's opinions describing his mental abilities.  According to Plaintiff, the ALJ's analysis violated principles set forth in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6th Cir. 2013), *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 402 (6th Cir. 2009), and Social Security Ruling 96-2p ("S.S.R. 96-2p").

At the outset, Dr. Dailey was not a "treating physician" for Plaintiff's mental health treatment.  A physician may be deemed a "treating source" if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir.

2007) (alteration in original) (*quoting* 20 C.F.R. § 404.1502).  Dr. Dailey's treatment notes do not reflect treatment for mental impairments with the frequency required for Plaintiff's medical condition.  As a result, the ALJ was not required to give "good reasons" for discounting Dr. Dailey's mental assessment.  Additionally, Plaintiff's arguments which center on *Gayheart*, *Blakley*, and S.S.R. 96-2p's guidelines regarding treating source opinions would not apply to Dr. Dailey's mental assessment.  Even assuming that such are applicable to Dr. Daily's mental and physical assessments, Plaintiff's allegations of error lack merit.

In *Gayheart* the Sixth Circuit found that the ALJ erred by applying stricter scrutiny to the opinion of the plaintiff's treating source than to the opinions of the consultative doctors on which he relied.  710 F.3d at 379.  The court explained that the ALJ's decision provided no indication that he applied the regulatory factors—supportability, consistency, and specialization—when weighing the consultative doctors' opinions, but was critical of the inconsistencies between the treating physician's opinions and other record evidence.  *Id.*  Based on *Gayheart*, Plaintiff argues that the ALJ imposed more rigorous scrutiny on the treating source opinion by favoring the non-treating and non-examining opinions, even though all of the opinions suffered the same flaw of relying on subjective complaints.  However, the Court does not agree.

The ALJ appropriately assessed whether each of the medical opinions at issue was consistent with and supported by the record.  Rather than making a blanket acceptance of the state agency opinions, the ALJ provided specific reasons for his decision to credit them.  As he did with Dr. Dailey, the ALJ accepted the consultative and reviewing sources' opinions only to the degree that the record justified doing so.

More specifically, in regard to Dr. Dailey's physical assessment, the ALJ provided a number of reasonable and well-supported justifications for granting little weight to the opinion.

16

The ALJ explained that Dr. Dailey's findings of serious limitations were inconsistent with the absence of positive strong clinical findings and her conservative treatment. (Tr. 389).  Dr. Dailey prescribed only medication and physical therapy, and did not recommend more aggressive treatment or the need to consult a surgeon. (Tr. 389-90).  The ALJ observed that Dr. Dailey assigned manipulative limitations due to Plaintiff's complaints of hand numbness and pain, but those complaints were never reflected in treatment notes. (*Id.*).  While the ALJ discounted Dr. Dailey's physical assessment because the doctor justified the limitations assigned on Plaintiff's subjective complaints rather than objective testing, the ALJ provided numerous other reasons to support his conclusion and was entitled to consider this factor in his analysis.

The ALJ also examined Dr. Scheatzle's opinion, and found the limitations assigned were generally consistent with the findings of the doctor's physical examination and other physicians, including tenderness to palpitation and diminished range of motion in the lumbar spine. (Tr. 390).  The ALJ discredited the doctor's conclusions to the extent that they were based on findings not supported by the record, such as positive straight leg raising and diminished sensation in the right leg, as no other treating physician reported these issues. (*Id.*).

Nor does the Court find that the ALJ scrutinized Dr. Dailey's mental health statement more closely than psychological reviewers' opinions.  The ALJ reasonably found Dr. Dailey's mental limitations ought to be discounted because her treatment notes did not reflect any clinical observations related to Plaintiff's mental health. (Tr. 391).  Moreover, Dr. Daily did not refer Plaintiff for psychological evaluation or treatment, despite the severe functional impairments she identified. (*Id.*).

The ALJ closely examined the state agency reviewing psychologists' opinions.  The ALJ explained that Dr. Waddell's findings were supported by the observations of psychological

17

examiner Dr. Reece, diagnostic testing as to Robinson's intellectual functioning and educational achievement. (Tr. 392-93).  As to Dr. Khan, the ALJ credited the reviewer's opinions, aside from his finding that Plaintiff would require re-direction or special supervision to carry out simple routine instruction, because during Dr. Reece's psychological examination, Plaintiff could maintain concentration, attention and persistence, without a need for redirection. (Tr. 393). Additionally, Robinson stated that he could maintain attention for as long as needed and could follow spoken instructions. (*Id.*).  Accordingly, the ALJ provided appropriate scrutiny to the medical opinions and his analysis is substantially supported.

Next, Plaintiff alleges that the ALJ erred relying on the opinions of the state agency physicians over those of Dr. Dailey because the state agency physicians did not have the opportunity to review the entire record, including Dr. Dailey's medical source statements.

Social Security Ruling 96-6p explains that "[i]n appropriate circumstances, the opinions from State agency medical . . . consultants may be entitled to greater weight than the opinions of treating or examining sources." *S.S.R. 96-6p, 1996 WL 374180, at *3 (July 2, 1996).*  For example, the ruling explains that this may occur when "the State agency medical . . . consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source." *Id.*

In *Blakley v. Comm'r*, 581 F.3d 399, 409 (6th Cir. 2009), the Sixth Circuit held that the ALJ's choice to attribute greater weight to state agency reviewing consultants over the plaintiff's treating sources was reversible error because the reviewing consultants' opinions were based on an incomplete case record.  The Sixth Circuit remanded the case because the court "require[d] some indication that the ALJ at least considered [the subsequent medical records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.' " *Id.*

(*quoting Fisk v. Astrue*, 253, F. App'x 580, 585 (6th Cir. 2007)); *see also Brooks v. Soc. Sec. Admin.*, 430 F. App'x 468, 482 (6th Cir. 2011) (ALJ might have relied on a state consultant's dated assessment "if the ALJ made clear that he had considered the effect of the subsequent medical records on the reliability of that assessment.").

Following *Blakley*, the Sixth Circuit indicated that the example set forth in the ruling "does not exhaust the range of 'appropriate circumstances' under which a non-treating source's opinion may be entitled to greater weight than that of a treating source. There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record. The opinions need only be 'supported by evidence in the case record.' " *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (internal citations omitted). In *McGrew v. Comm'r*, 343 F. App'x 26, 30-32 (6th Cir. 2009) the Sixth Circuit found an ALJ's reliance on state agency medical opinions' based on an incomplete record was not in error, because the ALJ considered medical examinations that were performed after the state assessments and accounted for changes in the plaintiff's condition in the RFC.

While Plaintiff's argument calls forth the proposition set out in *Blakely*, the case is distinguishable in light of its facts. In *Blakley*, the ALJ failed to comply with the treating source rule in analyzing the opinions of three treating physicians, including ignoring one treating source's opinion altogether. *Blakley*, 581 F.3d at 407-08. Here, the ALJ's opinion adequately explained why he attributed less than controlling weight to Dr. Dailey's opinions when deciding the RFC. Robinson does not now challenge the reasons the ALJ provided for discounting Dr. Dailey's physical and mental assessments. An ALJ's unsupported rejection of a treating source and reliance on non-examining sources without full access to the record appeared to be the

"overriding danger" that existed in *Blakley*, is not similarly present here. *See Curry v. Colvin*, No. 4:13-CV-00312, 2013 WL 5774028, at *17 (N.D. Ohio Oct. 24, 2013).

Additionally, *Blakley* involved an ALJ's reliance on state agency reviewing consultants, who formulated opinions as to the plaintiff's RFC based on an evaluation of the record.  On the other hand, in this case Dr. Scheatzle was a consultative examiner, who issued an RFC based upon a physical examination.  Given his status an examining, rather than reviewing physician, the specific concerns addressed by the Sixth Circuit in *Blakley* regarding non-examining physicians do not apply to Dr. Scheatzle.

Nevertheless, the ALJ sufficiently articulated why he credited the opinions of Drs. Scheatzle, Waddell, and Khan. (Tr. 390, 392-93).  The ALJ afforded each opinion great weight to the extent that it was supported by the record and cited evidence that bolstered his conclusions. (*Id.*).  The ALJ's statements demonstrate recognition that the state agency doctors' opinions were not in significant conflict with credible medical evidence that arose after their assessments, and therefore, retained reliability.

The ALJ's opinion also demonstrates his consideration of the relevant medical records that developed after the state agency examining and reviewing consultants issued their opinions. The only evidence that the reviewing psychologists did not have before them was Dr. Dailey's mental assessment, which the ALJ adequately accounted for. (Tr. 391-92).  The ALJ also addressed Plaintiff's continued treatment for physical impairments, including records from Drs. Dailey and Labibidi. (Tr. 388-90).

Plaintiff further maintains that the ALJ should have granted greater weight to Dr. Dailey's opinions based on the directives set out in Social Security Ruling 96-2p.  In relevant part, the ruling explains:  "In many cases, a treating source's medical opinion will be entitled to

the greatest weight and should be adopted, even if it does not meet the test for controlling weight." S.S.R. 96-2p, 1996 WL 374188, at *4 (July 2, 1996).  Nevertheless, the Sixth Circuit "has consistently stated that [the Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." Deaton v. Comm'r of Soc. Sec., 315 F. App'x 595, 598 (6th Cir. 2009) (quoting Bogle v. Sullivan, 998 F.2d 342, 347-48 (6th Cir. 1993)).  It is well established that the ALJ reserves the right to decide certain pertinent issues, such as the claimant's RFC, based on his evaluation of the medical and non-medical evidence. Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 728 (6th Cir. 2013).  Requiring the ALJ to "base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.' " Id. (quoting S.S.R. 96-5p, 1996 WL 374183 (July 2, 1996)).  Accordingly, it was the ALJ's prerogative to weigh the medical evidence, including Dr. Dailey's opinion, and formulate the RFC as he found reasonably supported by the record. Because the ALJ appropriately determined that Dr. Dailey's opinions were not consistent with the record or well supported, and provided good reasons for attributing less weight to the physician's opinions, the ALJ was not required to accord them great weight.

### C.  The ALJ's finding at step five

Robinson contends that the ALJ's step five finding is flawed for numerous reasons.  At the fifth and final step of the disability analysis, the ALJ must determine whether, in light of the claimant's RFC, age, education, and past work experience, the claimant can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v).  At this step, the burden shifts to the commissioner to prove the existence of a significant number of jobs in the national economy that

a person with the claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs. *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 799 (6th Cir. 2004) (*quoting Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).

Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question. *Id.* The VE's opinion testimony may only be used as substantial evidence of a claimant's RFC when that testimony is in response to a hypothetical question that "accurately portrays [the claimant's] individual physical and mental impairments." *Davis v. Sec'y of Health & Human Servs.*, 915 F.2d 186, 189 (6th Cir. 1990). Nevertheless, it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

### 1. Whether limitations included in the hypothetical question properly reflect those included in the RFC

Plaintiff alleges that the limitations set forth in the controlling hypothetical question posed to the VE did not match those included in the RFC. More specifically, Plaintiff notes that the hypothetical question limited him to occasional bending, but the RFC did not contain this limitation. (Tr. 38, 426-28.) It appears that the ALJ made a typographical error in failing to incorporate the bending limitation into the RFC, because the limitation was part of the controlling hypothetical question posed to the VE. (Tr. 427-28.) Upon remand, the ALJ may modify the RFC to include this limitation.

Additionally, Plaintiff argues that the hypothetical question limited him to "very minimal reading," while the RFC restricted him to reading at or below the third grade level.[5] (Tr. 386, 427-28).  Arguably "very minimal reading," which appears to speak to question of degree, may not coincide with reading below a third grade level, which is a matter of ability.  However, during the administrative hearing, the VE explained that the lowest language level the Dictionary of Occupational Titles ("DOT") categorizes is first to third grade. (Tr. 432). The VE indicated that this was the level assigned to the spray painter position, which the VE concluded Plaintiff could perform. (*Id.*).  At the hearing, Plaintiff's counsel did not challenge the VE's testimony in this regard.  Nonetheless, because remand is necessary on other grounds, the ALJ will have the opportunity to obtain VE testimony in regard to Plaintiff's ability to read as it is characterized in the RFC.

### 2.  Whether the ALJ improperly excluded physical and mental limitations from the RFC

Plaintiff points to a number of limitations which he believes ought to have been incorporated into the RFC.  Each limitation will be addressed in turn.

#### a.  Sit-stand option

According to Robinson, objective medical evidence and physicians' opinions establish that he requires a sit-stand option.  In support of including a sit-stand option in the RFC, Plaintiff points out that the prior ALJ adopted this limitation.[6]  Of Plaintiff's medical sources, it appears

---

[5] Both the RFC and the hypothetical question indicate that the Plaintiff cannot read prints or diagrams. (Tr. 386, 428).

[6] Although Plaintiff does not argue that the ALJ was required to adopt the earlier ALJ's conclusions, the Court notes that an ALJ is not bound by the findings of a prior ALJ, when findings were not a "final" decision. *Wireman v. Comm'r of Soc. Sec.*, 60 F. App'x 570, 571 (6th Cir. 2003).  An ALJ's decision on the merits of a disability application does not become final and binding if the Appeals Council vacates the decision and remands the matter for further proceedings. *Id.*

that Drs. Daily and Scheatzle recommended a sit-stand option. (Tr. 249, 359).  Upon review, the ALJ provided reasonable grounds for his decision not to include the restriction in the RFC.

It is well-established that for an ALJ's decision to stand, the ALJ is not required to discuss every piece of evidence in the record. *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  Nevertheless, if the opinion of a medical source contradicts the RFC finding, an ALJ must explain why he did not include its limitations in the determination of the RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011)  ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."); S.S.R. 96-8p, 1996 WL 374184, *7 (July 2, 1996).

As previously explained herein, in his treating source analysis, the ALJ gave good reasons for discounting Dr. Dailey's physical assessment, which included the sit-stand option. These reasons included a lack of positive clinical findings in treatment notes and only conservative treatment for Plaintiff's back pain. (Tr. 389-90).  The ALJ also explained that Dr. Scheatzle's findings of positive straight leg testing and diminished sensation of the right lower leg were not endorsed by physicians who regularly treated Plaintiff. (Tr. 390).  More specifically, the ALJ explained that Dr. Dailey did not observe sensory abnormalities and Dr. Lababidi repeatedly stated that straight leg testing was negative. (*Id.*).  Dr. Scheatzle based his limitations, in part, on these results of the physical examination.  The ALJ reasonably concluded that based on the record, there was not sufficient support for a sit-stand option.  Accordingly, the ALJ's rejection of the sit-stand limitation was substantially supported.

### b.  Use of a cane

Robinson also argues that the ALJ ought to have accounted for his need to use a cane in the RFC.  In relevant part, Social Security Ruling 96-9p states:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

1996 WL 374185, at *7 (July 2, 1996).  A recent case noted that:  "A cane would be medically necessary if the record reflects more than just a subjective desire on the part of the plaintiff as to the use of a cane. If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE." *Murphy v. Astrue*, No. 2:11-CV-114, 2013 WL 829316, at *10 (M.D. Tenn. Mar. 6, 2013) (internal citations omitted).

Robinson points out that he previously testified at his September 2009 hearing that he had been using a cane since being told to do so after a fall.  However, Robinson's testimony cannot qualify as "medical documentation establishing the need" for a cane under the regulations. *Mitchell v. Comm'r of Soc. Sec.*, No. 13-CV-1969, 2014 WL 3738270, at *12 (N.D. Ohio July 29, 2014) (finding that plaintiff's testimony explaining his need for a cane and recounting his doctor's recommendation regarding a cane did not meet the requirements of S.S.R. 96-6p).

Next, Robinson argues that Dr. Dailey recognized on multiple occasions that a cane was necessary. (Tr. 235, 240, 245-46).  However, these treatment records do not reflect Dr. Dailey's prescription of a cane or opinion that a cane was necessary, but rather, Plaintiff's own statements to the physician communicating that he used a cane.  On her medical statement, Dr. Dailey

commented that Plaintiff walked with a cane and checked a box indicating that Plaintiff was prescribed a cane. (Tr. 358-59).  Nevertheless, as the ALJ noted, Dr. Dailey's treatment notes do not reflect a prescription for a cane, nor is the Court otherwise aware of a medical source instructing Plaintiff to use a cane. (Tr. 389).  Neither Dr. Scheatzle nor Dr. Lababidi advised Robison to do so, despite the findings that Robinson highlights from their treatment records.

The ALJ went on to conclude that Plaintiff's clinical findings did not suggest the medical necessity of an assistive device, because while Plaintiff walked with an antalgic gait, he exhibited no deficits of lower extremity motor strength, sensation, or reflexes. (Tr. 389).  The undersigned finds the ALJ's reasoning to be substantially supported.  Robinson has not pointed to sufficient medical documentation establishing the need for a cane and describing the circumstances for which it is needed.  Accordingly, this argument is not well taken.

### c.  Writing and reading limitations

Plaintiff argues that the RFC does not address his limited writing ability.  Robinson asserts that his writing ability is below the third grade level, based on his WRAT spelling score at grade level 1.7 and his testimony.  Additionally, Plaintiff maintains that remand is required because the ALJ failed to evaluate Dr. Scheatzle's opinion on his reading and writing abilities.

The ALJ's opinion addresses Plaintiff's ability to read and write, including the WRAT scores, which the ALJ credited. (Tr. 391).  The ALJ also found Plaintiff's written statements and testimony from the September 2009 and July 2012 administrative hearings as to his limited ability "to read and write" were supported by the WRAT results. (*Id.*). The ALJ went on to incorporate Dr. Reece's findings as to Plaintiff's limited reading ability into the RFC, but did not include limitations with regard to writing. (*Id.*).  Because the ALJ accepted Plaintiff's statements regarding writing and the WRAT scores, the Court is unable to ascertain why the ALJ did not include a writing limitation in the RFC.  The Court notes that the VE testified Plaintiff could

26

perform his past work as a spray painter, as previously performed, which did not require writing. (Tr. 141, 150, 395, 428).  But, given that remand is otherwise necessary, the ALJ will have the opportunity to clarify his opinion with regard to Plaintiff's writing ability and any impact it might have on the disability determination.

As Plaintiff points out, the ALJ did not address Dr. Scheatzle's opinion that Plaintiff's reading and writing skills were limited to a third or fourth grade level. (Tr. 249).  Nonetheless, the RFC limits Plaintiff to reading at the third grade level, accounting for Dr. Scheatzle's opinion with regard to reading.  Upon remand the ALJ will have the opportunity to address Plaintiff's writing abilities, and if necessary, to address Dr. Scheatzle's opinion.

### d.  Moderate limitations in concentration, persistence, or pace

Plaintiff alleges that the RFC does not properly account for his moderate limitations in concentration, persistence, and pace.  At step three of the sequential analysis, the ALJ determined that Robinson had moderate difficulties in this area. (Tr. 386).  The ALJ then assigned the following mental limitations in the RFC:

> He could perform unskilled, simple, and routine tasks which can be learned in thirty days or less by short demonstration and require little judgment.  He could not read prints or diagrams and any required reading must be at or below the third grade level.  He could tolerate minimal stress, meaning tasks can involve no more than minimal interaction with the public, no high production quotas or fast paced work.

(Tr. 386-87).

In support of his argument, Plaintiff cites to *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Circ. 2010) for the proposition that a limitation to simple, repetitive tasks, without additional limitations, are insufficient to account for a claimant's moderate concentration problems.  Plaintiff's argument fails for a number of reasons.

27

To begin, *Ealy* is distinguishable from this case.  The record in *Ealy* demonstrated that the plaintiff had a limited ability to maintain attention, even when performing simple, repetitive tasks.  *Ealy*, 594 F.3d at 516.  Specifically, a state agency psychological consultant limited the plaintiff's ability to sustain attention to complete simple repetitive tasks to "[two-hour] segments over an eight-hour day where speed was not critical." *Id.*  Despite this opinion, the ALJ limited the plaintiff to only simple, repetitive tasks without any additional time-based limitations. As a result, the Sixth Circuit concluded that the ALJ failed to capture the plaintiff's limitations in concentration, persistence, and pace adequately. *Id.*

Furthermore, this Court has found that "*Ealy* does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks' for every individual found to have moderate difficulties in concentration, persistence, or pace." *Jackson v. Comm'r of Soc. Sec.*, No. 1:10-CV-763, 2011 WL 4943966, at *4 (N.D. Ohio Oct. 18, 2011).  Instead, "*Ealy* advocates a fact-based approach to determine whether, considering the record evidence, the plaintiff required specific limitations regarding his or her moderate difficulties with concentration, persistence, or pace." *Weagraff v. Comm'r of Soc. Sec.*, No. 1:11-CV-2420, 2013 WL 968268 (N.D. Ohio Jan. 7, 2013) (citing *Jackson*, 2011 WL 4943966, at *4); *see also Smith v. Comm'r of Soc. Sec.*, No. 13-10862, 2013 WL 6094745, at *8 (E.D. Mich. Nov. 20, 2013) ("[T]here is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled, routine work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC.").

Robinson's contention that the ALJ's restrictions were insufficient lacks merit as he fails to point to evidence requiring further limitations than those included in the RFC.  The ALJ did provide "additional limitations" in the RFC as required by *Ealy*.  Along with unskilled, simple,

and routine work restrictions, the ALJ specifically included pace, persistence, and concentration-related restrictions prohibiting high production quotas and fast-paced work to accommodate for Plaintiff's moderate difficulties.

Plaintiff argues that *Green v. Comm'r of Soc. Sec.*, No. CIV. 08-CV-11398-DT, 2009 WL 2365557 (E.D. Mich. July 28, 2009) held that a moderate limitation in concentration would result in an individual being off-task 20 to 30 percent of the workday.  Robinson asserts the VE here testified that an individual who would be off-task 20 percent or more during the workday would be unemployable.  Thus, he concludes that his moderate limitation renders him disabled.

However, Plaintiff's argument is flawed.  First, *Green* is not binding precedent on this Court.  Moreover, the court in *Green* explained:

> [I]f a moderate deficiency [in concentration] means drifting off task 20%-30% of the time, that would have a significant vocational impact unless quotas are eliminated from the hypothetical question or this limit is otherwise accounted for in the question.  It is difficult to reasonably accept "moderate" meaning anything less than 20%-30% of the time at work. Thus, "moderate" concentration problems . . . need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5 of that sequence. Simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient.

2009 WL 2365557, at *10.  Thus, *Green* found that a moderate limitation in concentration could result in a claimant being off-task 20 to 30 percent of a workday such that an ALJ must account for the limitation in the RFC beyond a limitation to unskilled jobs.  Nevertheless, the court explained that an ALJ can accommodate for such a deficit and may do so by eliminating quotas. The undersigned finds that the ALJ properly accounted for Robinson's moderate limitations in the RFC, and Plaintiff has failed to show further limitations were necessary.

### 3.  Whether ALJ erred in relying on VE testimony that Plaintiff could perform his past work as a spray painter

Plaintiff raises a number of objections to the ALJ's reliance on the VE's testimony.  The Court will not address these allegations of error as further administrative proceedings are required.  The Court does, however, observe that Plaintiff takes issue with the ALJ's reliance on the VE's testimony because: (1) it allegedly conflicted with the Dictionary of Occupational Titles ("DOT") and the ALJ did not obtain an explanation for the alleged discrepancies, and (2) because the VE relied on her own personal experience, rather than the DOT, to interpret some of the limitations included in the hypothetical question.

In light of these arguments, the Court wishes to highlight the following.  When cross-examining the VE, Plaintiff's counsel did not inquire as to whether the VE's testimony conflicted with the DOT in the manners that he now highlights before the Court.  Counsel has an affirmative obligation to question the VE if he or she believes a conflict exists between the VE's testimony and the DOT. *Walker v. Comm'r of Soc. Sec.*, No. 5:12-CV-1788, 2013 WL 5279077, at *9 (N.D. Ohio Sept. 18, 2013).  In *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008) the court held that "nothing in applicable Social Security regulations requires the administrative law judge to conduct his or her own investigation into the testimony of a [VE] to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge."  *Ledford* further explained that "neither the testimony of a vocational expert nor the occupational descriptions in the [DOT] necessarily trumps the other." *Id.*  The ALJ and the VE are not bound by the DOT in making disability determinations because the regulations do not require them to rely on the DOT's classification. *Id.* (*quoting Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003).

**D. Remand for rehearing**

Upon remand, the ALJ should resolve the following issues and obtain vocational expert testimony in support of the ultimate conclusions where necessary:

1. Plaintiff's literacy and qualification for disability under the medical vocational guidelines
2. Errors that may exist with regard to Plaintiff's ability to bend and read
3. Plaintiff's ability to write

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly, the Court VACATES the decision of the Commissioner and REMANDS the case to the Social Security Administration.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: March 11, 2015.